FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **INDICTMENT** |
| ) | (Fourteen Counts) |
| v. ) | |
| ) | 18 U.S.C. § 2 |
| JOHN M. BALES II (01), ) | 18 U.S.C. § 1014 |
| WILLIAM E. SPENCER (02), and ) | 18 U.S.C. § 1341 |
| PAUL J. PAGE (03) ) | 18 U.S.C. § 1343 |
| ) | 18 U.S.C. § 1344 |
| ) | 18 U.S.C. § 1349 |

3:11CR 147

**THE GRAND JURY CHARGES:**

**Introductory Paragraphs**

At all relevant times:

1. John M. Bales II was a founder and president and majority owner of Venture Real Estate Services, LLC, located in Indianapolis, Indiana and previously known as Meridian Asset Development, LLC (these entities are collectively called "Venture"). William E. Spencer was Venture's general counsel and part-owner. Paul J. Page was a real estate developer and Indianapolis attorney.

2. In 2006 and later years, the Indiana Department of Administration awarded Venture a contract to provide tenant representative services for certain State agencies. Venture has obtained about $1.93 million under these contracts.

3. When Venture applied for the contract in November 2005, Bales wrote that Venture would "exclusively align our interests with the State's goals and objectives" and would "never receive dual compensation on any transaction." When Venture applied for the contract in March 2009, Bales wrote that Venture "understand[s] the vital importance of preventing

conflicts of interest in lease transactions" and has "exclusive loyalties to tenants in all of our negotiations."

4.　Under the contracts, Venture identified buildings in which the State could lease space and helped to implement the leases. Venture agreed to negotiate with landlords "to obtain the most favorable terms and maximum safeguards for the agency being represented."

5.　Bales signed Venture's 2008 contract, which stated:

> **1.2　Restrictions on Dual Capacity.**
>
> **1.2.1　Prohibition of Ownership.** In carrying out its duties under this Contract, [Venture], its constituent members and their respective employees or agents, shall not have any ownership interest in, directly or indirectly, or acquire or attempt to acquire, either directly or indirectly, any properties to be leased by the State.

6.　Under the 2008 contract, Venture was entitled to receive three percent of the value of certain leases it negotiated. Venture had told the State that these commissions "shall be the only form of compensation." If Venture received more than three percent of the value of the lease from a landlord, it had to promptly deposit that money in a "discretionary project fund" for the State's use.

7.　The Department of Child Services wanted to move its Elkhart County offices into a building for sale at 1659 Mishawaka Street, Elkhart, Indiana (the "Elkhart Building"). Venture tried to find a buyer who would lease space in the Elkhart Building to the State and act as its landlord.

8.　An entity called L&BAB, LLC decided to buy the Elkhart Building in 2008 and lease space in it to the State. Page represented that he would be the sole owner.

2

9. Page applied for a loan from a bank ("Bank A") on behalf of L&BAB. Bank A provided over $500,000 for the purchase but L&BAB needed to provide the remaining money (over $350,000) to buy the Elkhart Building.

10. An entity called BAB Equity, LLC agreed to provide the additional money for the purchase. Spencer, who was a member of BAB Equity, wrote an agreement between L&BAB and BAB Equity, which Page and Bales signed.

11. Under the agreement, L&BAB would attempt to sell the Elkhart Building as soon as the State lease was signed and would pay BAB Equity 25 percent of the net proceeds (in addition to repaying the money from BAB Equity).

12. In April 2008, on behalf of BAB Equity, Bales wired money for L&BAB to buy the Elkhart Building. Page paid no money. Venture received a four percent lease commission and a broker's fee and L&BAB received a development fee, which it paid to Venture.

13. In July 2008, the State leased space for the Department of Child Services in the Elkhart Building from L&BAB for ten years for at least $2.21 million. L&BAB has not sold the Elkhart Building and collects the State's monthly rent payments of over $20,700.

14. Although Venture told the Department of Administration in 2008 that it had deposited one percent of the value of the Elkhart Building lease into the discretionary project fund, Venture did not do so until 2010, after it had learned of this federal investigation.

15. Bales, Spencer, and Page did not disclose the details of the arrangement between L&BAB and BAB Equity to the Department of Administration, and did not disclose the details of the arrangement to Bank A prior to receiving its money to buy the Elkhart Building.

**THE GRAND JURY FURTHER CHARGES:**

## Count 1
## (18 U.S.C. § 1349)

1.      The grand jury incorporates by reference Introductory Paragraphs 1 through 15.

2.      From in or around 2008 through in or around 2010, in the Northern District of Indiana,

**JOHN M. BALES II, WILLIAM E. SPENCER, and PAUL J. PAGE,**

defendants herein, knowingly and willfully conspired and agreed to commit the following offenses against the United States:

A.      To knowingly execute a scheme to obtain moneys owned by and under the control of a financial institution, the accounts of which are insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344;

B.      To devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly cause items to be sent, delivered, and moved by the United States Postal Service and an interstate commercial carrier, in violation of 18 U.S.C. § 1341; and

C.      To devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and

promises, to knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain writings, signs, signals, and sounds, in violation of 18 U.S.C. § 1343.

**Purposes of the Conspiracy**

The purposes of the conspiracy among Bales, Spencer, Page, and others included, among other things, the following:

3. A purpose of the conspiracy was for Venture to profit from the Elkhart Building in at least four ways: first, by keeping the entire $88,400 lease commission (even though Venture's contract required it to deposit $22,100 – the amount of commission that exceeded three percent of the value of the lease – into the discretionary project fund); second and third, by obtaining and keeping a $28,875 broker's fee and a $22,700 development fee (even though Venture told the State that Venture would "never receive dual compensation on any transaction" and that commissions "shall be the only form of compensation"); and fourth, by obtaining 25 percent of the net proceeds when it sold (even though Venture was prohibited from having any ownership interest in the Elkhart Building and even though Venture told the State that it would "exclusively align our interests with the State's goals and objectives," that it would "never receive dual compensation on any transaction," and that commissions "shall be the only form of compensation").

4. A purpose of the conspiracy was for L&BAB to obtain Bank A's money without disclosing L&BAB's arrangement with BAB Equity, which allowed L&BAB to buy the Elkhart Building without Page paying any money.

## Manner and Means of the Conspiracy

The manner and means by which Bales, Spencer, Page, and others sought to accomplish the conspiracy included, among other things, the following:

5. It was part of the conspiracy that L&BAB would buy the Elkhart Building.

6. It was part of the conspiracy that BAB Equity would provide money for L&BAB to buy the Elkhart Building.

7. It was part of the conspiracy that Bales, Spencer, and Page would hide the details of the arrangement between L&BAB and BAB Equity from the Department of Administration, and would hide the details of the arrangement from Bank A prior to receiving its money to buy the Elkhart Building.

## Overt Acts

In furtherance of the conspiracy and to accomplish its ends, Bales, Spencer, Page, and others committed and caused to be committed various acts in the Northern District of Indiana and elsewhere, including the following, on or about the following dates:

8. On February 22, 2008, Venture formed L&BAB to buy the Elkhart Building.

9. In March 2008, Page applied to Bank A for a loan on behalf of L&BAB to buy the Elkhart Building.

10. On March 11, 2008, Page emailed Bank A regarding the Elkhart Building: "I will be 100% owner." Then Page emailed Bales: "Here's how I have spun this with [Bank A]." Bales forwarded Page's email to Spencer on the same day.

11. On March 13, 2008, Spencer emailed Bank A the proposed lease for the Elkhart Building between L&BAB and the Department of Administration.

12. On March 18, 2008, Page signed a summary of terms and conditions regarding L&BAB's anticipated loan from Bank A. L&BAB agreed, as a condition to the loan, to provide "[c]ash equity" for the purchase at closing and to pledge that "there will be no further debt on" the Elkhart Building.

13. On March 19, 2008, BAB Equity was created to provide money for L&BAB to buy the Elkhart Building.

14. On March 24, 2008, Spencer provided Bales a memorandum regarding the agreement between BAB Equity and L&BAB. It stated:

> Attached is the proposed equity agreement for Elkhart. The deal is simple.
> 1. L&BAB signs the lease (which is done),
> 2. L&BAB executes a construction agreement to build-out the DCS space,
> 3. L&BAB applies for financing (which is ongoing),
> 4. BAB provides all required equity,
> 5. Upon sale of the building,
>    a. BAB gets all of its equity
>    b. BAB gets 25% of net over equity
>    c. L&BAB gets 75% of net over equity
>
> Please sign it and get it back to me. Let me know if you have any questions. Thanks.

Bales and Page signed this agreement.

15. On April 6, 2008, Bales emailed Spencer regarding the purchase of the Elkhart Building: "why don't we fund the equity and then accelerate all our fees at closing."

16. On April 14, 2008, Spencer emailed the seller's agent and the title company that was handling the closing on the Elkhart Building that the "buyer" would wire funds. On April 18, 2008, Bales wired $361,635.63 to the title company. The title company also received $531,450 for the purchase from Bank A.

17. On April 18, 2008, Page signed a loan agreement with Bank A. L&BAB represented that all "financial statements and other financial data which have been or will be furnished Bank by [L&BAB or Page] are, and will be true and correct in all material respects, and reflect and will reflect fairly the financial condition of" L&BAB or Page; that no "material adverse change has occurred in the financial condition, operations, business or prospects of [L&BAB or Page] since the last financial statements furnished Bank"; that it "is not a party to or bound by any contract or agreement which is an agreement materially adversely affecting [L&BAB's] business, operations or financial condition"; that it would "[i]nform Bank promptly upon becoming aware of the occurrence of any Event of Default"; that it would not "incur in the future any other indebtedness for borrowed money except to" Bank A; that it would not "mortgage or otherwise encumber [the Elkhart Building] to anyone other than" Bank A; and that it would "certify to the truth, accuracy, and completeness" of these representations "[a]t the time of each disbursement of proceeds" under the loan.

18. On April 18, 2008, Page signed a mortgage with Bank A. L&BAB represented that "there has been no prior assignment of any of [L&BAB's] rights" in the Elkhart Building and that L&BAB "will not further mortgage . . . or otherwise dispose of, further encumber or suffer the encumbrance" of the Elkhart Building without Bank A's permission. On April 28, 2008, this mortgage was filed in Elkhart County.

19. On April 18, 2008, Page signed a mortgagor's closing affidavit. L&BAB represented that, since it had applied for the mortgage, it "has not incurred or entered into any material liabilities or obligations, direct or contingent, or entered into any material transaction or agreement other than in the ordinary course of business."

20. On April 22, 2008, Venture received an $88,400 commission from the Elkhart Building transaction, which was four percent of the value of the lease. Venture had prepared an invoice for this amount to L&BAB on April 14, 2008. This money was ultimately deposited into the same account from which Bales had paid the money used to buy the Elkhart Building.

21. On April 22, 2008, Venture received a broker's fee of $28,875 from the Elkhart Building transaction. Venture had prepared an invoice for this amount to the title company on April 16, 2008. This money was ultimately deposited into the same account from which Bales had paid the money used to buy the Elkhart Building.

22. On April 23, 2008, L&BAB received a development fee of $22,700 from the Elkhart Building transaction. On October 3, 2008, L&BAB paid $22,700 to BAB Equity, which ultimately deposited $22,700 into one of Bales' accounts.

23. On May 7, 2008, Spencer emailed the Department of Administration that Venture had "deposited the entire amount due to the fund from all fees received to date - per our contract," and provided this message to Bales the next day. Although the 2008 contract required Venture to deposit $22,100 from its Elkhart Building lease commission into the discretionary project fund, Venture had not done so.

24. On June 12, 25, and 29, 2008, Page requested that Bank A disburse additional funds under the loan agreement in connection with the renovation of the Elkhart Building. Page stated: "All representations and warranties contained in the Agreement are true and correct as if they were made as of, and referred to, both the date of the Agreement and the date hereof." Page also stated: "There has been full compliance with the covenants set forth in the documentation executed by the borrower pursuant to the Agreement."

25. In June 2008, Venture and Page began trying to sell the Elkhart Building.

26.  On July 3, 2008, Page signed a "Personal Balance Sheet" for Bank A. Page did not disclose L&BAB's arrangement with BAB Equity to Bank A.

27.  In February 2009, Page sought to increase the amount of Bank A's loan. Page did not disclose L&BAB's arrangement with BAB Equity to Bank A.

28.  On February 17, 2009, Page signed an amendment to the loan agreement, increasing the loan amount to over $1.19 million and stating that "the representations and warranties contained in the [loan agreement] are correct as of the date of this Amendment."

29.  On February 17, 2009, Page signed an amendment to L&BAB's mortgage with Bank A. This amendment secured "the performance of the terms, covenants and conditions contained in" the prior mortgage documents and "ratified and affirmed" the earlier mortgage. On March 4, 2009, this document was filed in Elkhart County.

30.  On April 16, 2009, Venture estimated that Bales and Spencer would receive $308,415 and $24,095, respectively, in connection with a potential sale of the Elkhart Building.

31.  On July 15, 2009, Page withdrew $50,000 from L&BAB's account, which BAB Equity believed to violate their agreement. Thereafter, in October 2009, Spencer emailed Bales an unsigned promissory note and mortgage between L&BAB and BAB Equity for the Elkhart Building. Spencer stated: "[e]verything is dated May, 2008." Bales emailed these documents to Page on October 20, 2009 and asked Page to "[c]all me about this." Page had the signed documents emailed back to Venture on October 30, 2009. The notary stamp on the mortgage indicated that Page had signed it on May 18, 2008.

32.  On November 3, 2009, Spencer emailed: "I will handle getting the mortgage recorded." On November 23, 2009, BAB Equity filed in Elkhart County the mortgage dated May 18, 2008.

33. On December 19, 2009, Spencer wrote a letter to the Department of Administration and emailed it to Bales for review. The letter stated: "I have never recommended that the State lease space in any building in which I have an ownership interest." The letter described the purchase of the Elkhart Building but never referenced L&BAB's arrangement with BAB Equity. On December 22, 2009, Bales emailed a substantially similar letter to the Department of Administration.

34. On March 16, 2010, Spencer emailed Bales and the Department of Administration that Venture has "not acted so as to give rise to a conflict of interest," but never referenced L&BAB's arrangement with BAB Equity. In response, on March 17, 2010, the Department of Administration emailed Spencer: "I have been asked for a final clarification that none of Venture's Principals have an interest or ownership in any buildings where DCS or other State agencies are tenants." On the same day, Spencer forwarded that email to Bales, stating: "Maybe they will just keep asking until they get an answer they like . . ." Spencer then informed the Department of Administration, around March 19, 2010, that none of Venture's partners had an ownership interest in any properties that Venture arranged to lease to the State.

35. Although Venture received a lease commission of $88,400 in April 2008 from the Elkhart Building lease, it did not then deposit $22,100 (the amount of commission it received in excess of three percent) into the discretionary project fund for the State's use. It was only after Venture received a request on June 17, 2010, for records related to this federal investigation, that it remitted $22,100 to the discretionary project fund on July 21, 2010.

All in violation of Title 18, United States Code, Section 1349.

**THE GRAND JURY FURTHER CHARGES:**

**Count 2
(18 U.S.C. § 1014)**

1. The grand jury incorporates by reference Introductory Paragraphs 1 through 15 and Paragraphs 1 through 35 of Count 1.

2. In or around March 2008 through in or around February 2009, in the Northern District of Indiana,

**PAUL J. PAGE,**

defendant herein, knowingly made false statement(s) for the purpose of influencing the action(s) of Bank A, the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with application(s) and loan(s).

In violation of Title 18, United States Code, Section 1014.

THE GRAND JURY FURTHER CHARGES:

## Count 3
## (18 U.S.C. §§ 2, 1344)

1. The grand jury incorporates by reference Introductory Paragraphs 1 through 15 and Paragraphs 1 through 35 of Count 1.

2. From in or around March 2008 through in or around February 2009, in the Northern District of Indiana,

**JOHN M. BALES II, WILLIAM E. SPENCER, and PAUL J. PAGE,**

defendants herein, knowingly executed a scheme to obtain moneys owned by and under the control of Bank A, the accounts of which are insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Sections 2 and 1344.

**THE GRAND JURY FURTHER CHARGES:**

## Counts 4 - 6
## (18 U.S.C. §§ 2, 1341)

1.  The grand jury incorporates by reference Introductory Paragraphs 1 through 15 and Paragraphs 1 through 35 of Count 1.

2.  On or about the dates listed below, in the Northern District of Indiana,

**JOHN M. BALES II, WILLIAM E. SPENCER, and PAUL J. PAGE,**

defendants herein, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly caused to be sent, delivered, and moved by the United States Postal Service and an interstate commercial carrier, the following items:

| COUNT | DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|---|
| 4 | 4/17/08 | Seller's agent in Elkhart | Title company | Documents related to sale of Elkhart Building |
| 5 | 4/21/08 | Title company | Seller's agent in Elkhart | Documents related to sale of Elkhart Building |
| 6 | 4/21/08 | Title company in Indianapolis | Title company in Crown Point | Documents related to sale of Elkhart Building |

All in violation of Title 18, United States Code, Sections 2 and 1341.

**THE GRAND JURY FURTHER CHARGES:**

**Counts 7 - 14**
**(18 U.S.C. §§ 2, 1343)**

1.      The grand jury incorporates by reference Introductory Paragraphs 1 through 15 and Paragraphs 1 through 35 of Count 1.

2.      On or about the dates listed below, in the Northern District of Indiana,

**JOHN M. BALES II, WILLIAM E. SPENCER, and PAUL J. PAGE,**

defendants herein, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communications, certain writings, signs, signals, and sounds, as follows:

| COUNT | DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|---|
| 7 | 4/14/08 9:02 AM | Spencer | Seller's agent in Elkhart (email routed interstate) | Email regarding closing date for Elkhart Building |
| 8 | 4/14/08 10:06 AM | Spencer | Seller's agent in Elkhart (email routed interstate) | Email regarding closing for Elkhart Building |
| 9 | 4/14/08 10:31 AM | Spencer | Seller's agent in Elkhart (email routed interstate) | Email stating that "[b]uyer will wire money" for purchase |
| 10 | 4/16/08 11:08 AM | Title company | Seller's agent in Elkhart (email routed interstate) | Email (also addressed to Spencer) containing closing documents |
| 11 | 4/18/08 11:04 AM | Bank A | Seller's agent in Elkhart (email routed interstate) | Email (also addressed to Spencer and Page) about closing payments |

| COUNT | DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|---|
| 12 | 4/18/08 11:47 AM | Bank A | Seller's agent in Elkhart (email routed interstate) | Email (also addressed to Spencer and Page) about loan amount |
| 13 | 4/18/08 3:49 PM | Bales' brokerage firm | Title company's bank in Indiana (wire routed interstate) | $361,635.63 wire for purchase of Elkhart Building |
| 14 | 4/21/08 9:40 AM | Title company | Seller's agent in Elkhart (email routed interstate) | Email (also addressed to Spencer) containing closing documents |

All in violation of Title 18, United States Code, Sections 2 and 1343.

## FORFEITURE ALLEGATION

Upon conviction of any of the offenses alleged in Counts 1 through 14 of the Indictment, **JOHN M. BALES II, WILLIAM E. SPENCER, and PAUL J. PAGE,** defendants herein, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from proceeds traceable to violations of the offenses.

Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), the defendants shall forfeit substitute property, up to the value of the amount described in the preceding paragraph, if, by any act or omission of the defendants, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

A TRUE BILL:

s/Grand Jury Foreperson
Grand Jury Foreperson

DAVID CAPP
UNITED STATES ATTORNEY

By: s/Jesse M. Barrett
Jesse M. Barrett
Assistant United States Attorney